Our fourth case for argument this morning is Bellevue v. UHS of Hartgrove. Mr. Rosenblatt. Good morning, Your Honors. May it please the Court. This is a basic False Claims Act case. The government paid for patient rooms but didn't get patient rooms. Instead, what the government got for these Medicaid recipients was rooms or beds in hallways and day rooms and not what they actually paid for. Mr. Rosenblatt, I'm not entirely sure after reading your brief that I understand your client's claim. Substantial sections of the brief seem to say that if a hospital is overcrowded, it's fraudulent to bill for any patient at all, even one in a regular room receiving full services. Is that your argument? No, Your Honor. The argument is simpler than that. The first argument is an express false claim where when they submit a claim for a Medicaid patient and submit a bill under the UB-04 form or the cost report, and they say the patient is given a patient room and the patient is not. Okay. All right. Let me restate it. Your only claim concerns those patients who you say the hospital represented to be in regular rooms who were not. That's correct. Let me explain further on. When you look at the express or the applied false certification cases, which Universal Health Services addresses, it's the same thing. In Universal Health Services versus Escobar, the Supreme Court case, in that case Escobar's stepdaughter was being treated by providers who were not licensed. What happened in that case obviously went to the Supreme Court, and the Supreme Court found that there's specific representations made about the treatment of Escobar's stepdaughter that they failed to disclose the regulatory violations, which was in fact misleading. But then explained for materiality purposes, anybody looking at those claims from Medicaid would rightfully assume that Escobar's stepdaughter was being treated by people that were licensed. Here in Illinois, anybody at the Department of Health Care and Family Services looking at a claim for a Medicaid recipient at Harcourt Hospital would rightly assume that that patient is given a patient room and a bed, and not would be assuming that that patient was sleeping in a hallway or a day room on a rollaway bed or a cot. So the licensing allegation falls in and is relevant to the implied false certification claim, and that's how we get to there. In terms of the third claim we have, which could be alleged that it would mean all the claims are false, would be if the court upholds and we win at trial a fraudulent inducement claim. Under that claim, every claim would be false and submitted to the Medicaid program by Harcourt. I thought you just said you were not making an argument that every claim was false. Well, just take something simple. A hospital has 100 beds and admits 101 people, and one of the people is on a cot someplace in a gym and not getting proper treatment. I asked you if there's any problem with the claim submitted on behalf of 100, and you said no. And you're now making, it sounded to me, like the argument you would make if the answer were yes. So is the answer yes or no? Well, the answer would be no for an expressed false claim. The answer would be no for the implied false certification. The answer would be yes if liability was found under a fraudulent inducement claim. Because a fraudulent inducement claim would be similar to a- I think that just makes your claim look ridiculous. That's what your brief was stressing, that every claim submitted for all 101 patients was fraudulent in my example. If that's where your stress was in the district court, I completely understand why the district judge threw this suit out. I think when you take the claims under the different theories, you have different results in terms of damages. I think if we alleged a violation of an anti-kickback statute, the case law supports that all the claims submitted would be false. That would be true if we were to win on our fraudulent inducement claim. The basic claims, though, the heart of this case, are patients sleeping on rollaway beds or cots in hallways and day rooms, and the state of Illinois, the Medicaid program, paying for those patients as though they are in patient rooms on a hospital bed. Is this an upcoding problem? Is there a different rate that should be reimbursed if people are being provided care but not in as nice a circumstance? No, Your Honor, it's a strict for false claim case, where they are saying that the patient's inpatient and they're not being given a patient room. So you're saying they're not entitled to collect any money for the service provided? For those patients until they're put into a patient room with a bed. So it could be a day or two for a few patients on those specific expressed false claims. So under the expressed false claim theory, which is the most basic and direct claim, Heartgrove is submitting claims for patients and not providing the services they promised to provide the state of Illinois, the Medicaid program. Under the implied false certification theory of liability, there's three elements, which I briefly discussed a minute ago. There's the specific representations, and those representations are in this form called the UB04 form, and on the cost report, which is a form that's submitted yearly to reconcile the payments to Heartgrove. The second thing is they fail to disclose those regulatory violations, that they're over census. And the fact that they're over census is important because by telling Medicaid that they're over census, it's telling Medicaid there's potential for these Medicaid recipients to be sleeping in hallways and day rooms and not in patient rooms. The third element is materiality. And what would a reasonable person think and conclude? And a reasonable person looking at these claims being submitted by Universal Health Services, Heartgrove Hospital, would assume that these patients were in patient rooms with beds. I believe this court in, I believe it's Apster versus Moments, stated that it's important for, excuse me, that it's important that the Medicaid program not be misled into what services were being provided. And that's exactly what Heartgrove did when it submitted claims to the Medicaid program. Our third argument, our third cause of liability would be under the fraudulent inducement claim. And under that claim, we have Mr. Bellevue spoke to two individuals, employees of Heartgrove, who worked there prior to he worked there, and who worked there before the most recent agreement between Medicaid and Heartgrove was entered into. And these individuals told Mr. Bellevue that they were over census prior to signing their agreement because they were at their old facility, which is on Ridgeway Road, and now they're on Roosevelt Road. Based on that, we know that Heartgrove did not comply with the over census requirements at the old facility, and we know they're not complying at the new facility. And that information should be sufficient for us to state a claim for fraudulent inducement, claiming that Heartgrove had no intent of complying with the terms of its agreement when it entered into it with the Illinois Department of Public Aid at the time, now the Illinois Department. If the government were to bring such an action, going back to what, 2007? Yes, Your Honor. Would they, you think, have a valid claim for all Medicaid payments over those years? I believe the law would be based on the answer to that question, based on where their liability is found. I think we can look at the fraud. Under a fraudulent inducement claim, it means- That's what I'm asking. Right, Heartgrove lied to them to enter it. And I believe that would be what the current law is, that they'd be liable for all the claims submitted. Without any offset for the value of services provided? No. In terms of damages, there are, you know, damages are often looked at in terms of contract terms. What is a loss to the government? The government could come up with a different loss. They don't have to say every claim is, I think, they don't have to say that every single claim is fraudulent because the hospital's over census in certain situations. Comparing it to an anti-kickback claim where the government has held the position that every claim is fraudulent, and they're buying the anti-kickback statute, I think a fair argument here would be the actual damage to the government, the actual, potentially actual amount of patients that are not being given room on those specific dates. That would be a reasonable interpretation. So you would shift back to the narrower claim of theory for damages? Well, obviously that's a rule, an issue we'd get to probably several years from now. But I believe we're talking about fairness, and I think we all, I think we have to have a position that we want a reasonable outcome. It wouldn't be necessarily a reasonable outcome to claim because they're over census on one day, and I don't think that every single claim for every patient in the hospital would be fraudulent for that one day. It's only for the, I think it would be fair to say it's only for the patients that are sleeping in hallways and day rooms who are not getting what they paid for. I noticed that I'm going into, I believe, my rebuttal time, so if I could get- Attorney, Mr. Rosenblatt. Thank you, Justice DeBrook. Mr. Tirani. Thank you, Your Honor. May it please the court, Amir Tirani for Defendant UHS of Hartgrove. The district court correctly concluded that the plaintiff failed to state a claim under any of his three theories of False Claims Act liability. Moreover, in addition to relying on the deficiencies identified by the district court, this court can also affirm the dismissal of plaintiff's complaint because his claims are foreclosed by the public disclosure bar and because he failed to plausibly allege materiality. I'd like to begin with the public disclosure bar because at least with respect to plaintiff's claims before March of 2010, that bar is jurisdictional. The public disclosure bar prohibits private plaintiffs from bringing False Claims Act suits on behalf of the government where the allegations are already in the public domain and where the plaintiff is not an original source of those allegations. The district court correctly concluded that as to plaintiff's claims of False Claims Act violations before May of 2009, those claims were publicly disclosed by two audit reports that documented overcapacity admissions at Hartgrove Hospital. Those audit reports were issued in March of 2009 and in May of 2009. The district court erred, however, in concluding that with respect to allegations of violations after May of 2009, that those allegations were not in the public domain. The district court reached that conclusion because it did not have the benefit of this court's subsequent decision in cause of action versus Chicago Transit Authority. In that 2016 case, this court made clear that alleging the continuation of violations that have already been publicly disclosed is insufficient to take a plaintiff's complaint outside the ambit of the public disclosure bar. In the cause of action case, there was an audit report that documented misreporting by the Chicago Transit Authority between 1999 and 2004. The plaintiff in cause of action filed suit in 2012 and alleged that those violations had continued during the intervening period. This court held that the allegations were part of a continuing fraud and all of the allegations without respect to time frame were publicly disclosed. That is precisely the case here where a plaintiff is alleging that the overcapacity admissions that were documented in the March and May 2009 audit reports continued through the time that he filed his amended complaint in 2015. All of those allegations are substantially similar to the allegations disclosed in the two audit reports and are therefore barred by the public disclosure provision. The district court concluded that with respect even to the allegations before May of 2009, that plaintiff was not barred by the public disclosure provision because he was an original source. That conclusion was error because once again the court did not have the benefit of this court's later precedent. In Bogina v. Medline, a decision issued after the district court opinion in this case, this court made clear that the 2010 amendments to the definition of original source apply retroactively without regard to the date of the underlying allegations. The district court applied the pre-2010 definition of original source in concluding that the plaintiff met the criteria for being an original source. The district court instead should have applied the post-March 2010 definition which asks whether the plaintiff has knowledge that is independent of and materially adds to the allegations that are already in the public domain. Nothing in plaintiff's complaint materially adds to the substance of the audit reports that disclosed the overcapacity admissions at Hartgrove. And again, this court's decision in cause of action controls the outcome of this case because in cause of action this court held that alleging the continuation of violations that had been publicly disclosed does not materially add to the substance of those allegations and does not render a plaintiff an original source. For those reasons, this court should affirm based on the public disclosure bar. If, however, this court concludes that it has jurisdiction, it should nevertheless affirm the district court's decision because that court correctly concluded that the plaintiff had failed to state a claim under any of his theories. With respect to the narrowest of those theories, the factual falsity theory, plaintiff is alleging that when Hartgrove submitted claims for inpatient services, it was making a factually false representation because according to plaintiff an inpatient is a patient who receives a private patient room. But plaintiff does not point to anything in Illinois law, in federal law, or in the relevant Medicaid participation agreement that equates inpatient services with a private patient room. For that reason, the district court concluded that this theory was borderline frivolous because there is nothing in relevant governing law that requires a hospital to provide a private patient room to an inpatient. The plaintiff's implied false certification theory also fails as a matter of law because the plaintiff is unable to meet the two elements of that claim established by the U.S. Supreme Court in Escobar and this court in Sanford Brown. To plead an implied false certification claim, a plaintiff must allege first that a defendant made specific representations about the services that it was providing to the government. And second, the plaintiff must allege that those specific misrepresentations were rendered misleading by the defendant's failure to disclose its violation of a statutory, regulatory, or contractual requirement. The plaintiff failed to plead either of those elements in this case. He fails to allege anything about the substance of the claims that Hartgrove submitted for inpatient services in this case. We don't know anything about alleged specific representations that were made by Hartgrove in submitting claims for payment. In any event, plaintiff's claim fails under the second element of an implied false certification claim because plaintiff does not plausibly allege that any representations that Hartgrove did make were rendered misleading by Hartgrove's overcapacity admissions. There is no allegation, for example, that the quality of care that Hartgrove rendered to patients when it was operating overcapacity was any way compromised by these overcapacity admissions. So there's nothing about the alleged contractual or licensing violations here that renders misleading the substance of any representations that Hartgrove made in its claims for payment to the government. Third, the district court correctly concluded that plaintiff's final theory, his fraudulent inducement theory, also fails as a matter of law because it rests on the unadorned and conclusory allegation that when Hartgrove entered into its Medicaid participation agreement in March of 2007, that it had no intent to comply with the underlying contractual requirements. Why isn't that a reasonable inference, at least at the 12B6 stage, given plaintiff's allegations that the hospital was frequently violating the census requirements before, during, and after the entire process? Your Honor, Mr. Bellevue was not employed at Hartgrove. I understand that. So he has no firsthand knowledge. He doesn't have to have firsthand knowledge, does he? He doesn't have to have firsthand knowledge, Your Honor, but he does have to allege with plausibility that there were ongoing violations during that period. He has alleged it, okay. He has alleged that he had conversations with two unidentified employees, employee A and employee B, who allegedly told him that during the period before March of 2007 that there were overcapacity admissions at Hartgrove. But we don't know who those employees are. This is a 12B6 motion, right? It is a 12B6 motion. Is he required to identify them in the complaint? He's required to plead. Is he required even to identify his source of knowledge? He's required to plead fraud with particularity, Your Honor. Which means? Which means that he needs to provide sufficient detail for this court to assess the plausibility of these very serious allegations that are being rendered. And with respect to these two employees, we don't know who they are or what positions they held at Hartgrove during the relevant time. What authority requires that kind of particularity in fraud allegations? We have our who, what, when, where requirements. It seems to me that's specified here. The practice has been described, time, location, who's doing it, namely the management of the hospital, and a practice that's consistent before, during, and after. Why is more needed at the 12B6 stage? Your Honor, there must be enough for this court to assess the plausibility of the fraud allegations. And the plausibility depends on whether these unnamed employees were administrators or high-level staff or, on the other hand, were part-time members of the janitorial staff. The positions that they had at the hospital affect the plausibility of their allegations that Hartgrove was violating. People at fairly low levels of organizations often know a lot about what's going on in them. And it sounds to me like what you're describing is a credibility evaluation that would be very difficult on 12B6. Your Honor, if these employees work five hours a week at Hartgrove Hospital in a low-level filing position, then it's not plausible that they would know about Hartgrove's admissions practices during the relevant time period. So the fundamental flaw is that we don't know enough about these two employees. You don't know what the plaintiff's evidence is. We don't know about the basis for his allegation that Hartgrove did not have the intent to adhere to its licensing obligations in March of 2007. Let me also add that. Let's suppose they're high-level administrators who have since left and no longer owe any particular duty of loyalty to the hospital and who would come forward and say, in essence, our business model was to stay about 10% above census. Would that be a plausible allegation of fraudulent inducement? Not standing alone, Your Honor, because we also need to know what happened after Hartgrove entered into the agreement. And we continued. Then with that level of particularity and plausibility, it may be sufficient, but we don't have that here because the allegations on which plaintiff is relying do not speak at all to what transpired after March of 2007. He offers his conclusory allegation that between 2005 and 2015, there were overcapacity admissions. But with respect to the period after March 2007, when Hartgrove entered into its participation agreement, and December of 2008 when the audit report first began to examine Hartgrove's practices, there are no allegations about overcapacity admissions that are offered with the requisite plausibility and particularity. So the theory is that the audit reports happen to catch just the only times that the hospital was over census, what, was 52 times in about 90 days? That's correct. It was just bad luck. No, Your Honor. We're not denying that there were overcapacity admissions. But only during the audit period? No, Your Honor. I'm not here to tell the Court that either. What I am saying is that the plaintiff needs to allege that when Hartgrove signed its participation agreement, it had no intent to adhere to the requirements. And if Hartgrove intended in good faith to adhere in March of 2007, and only six months or a year later reverted back to overcapacity admissions, then that does not suggest that there was, in fact, an intent to defraud. In any event, there is an overarching flaw in all of plaintiff's claims here, which is his inability to plead materiality. That is an essential element of all of plaintiff's claims, and he does not allege in his complaint that if the government had known about these overcapacity admissions, that the government's decision with respect to the payment of Hartgrove's claims would have been different. That is a rigorous standard, as the U.S. Supreme Court emphasized in the Escobar case. And the complaint is silent with respect to materiality, except when the plaintiff parrots the plain language of the False Claims Act, and in paragraph 64 when he offers another unadorned reference to materiality. Thank you, Your Honors. Thank you, Counsel. Anything further, Mr. Rosenblatt? Just briefly, I'd like to address one of the points that Mr. Tirani brought up in his argument. And that's the point where he started out with the public disclosure bar. I know the court didn't ask me any questions about that when I gave my initial argument. But for a public disclosure, there has to be three steps which the court goes through in analyzing that, and that's obviously a cause of action. The first step is whether there's been a public disclosure of the allegations. The allegations mean allegations of fraud. There has to be evidence that somebody can infer that the defendant knowingly submitted false claims to the government. In those audit reports, there's nothing in there to infer that any of that took place. There's no evidence that any claims were submitted to the Medicaid program, that any of these patients were Medicaid who were subject to being over-censused, or that any patients whatsoever were even sleeping in dayrooms or hallways on rollaway beds or cots. The second element has to be substantially similar. George Belfiore gives specific examples of names and dates of patients sleeping in dayrooms, and that is not something that's ever disclosed in those two letters, one from CMS and one from the Illinois Department of Public Health. Another issue on the public disclosures, taking a step back, is that some courts, I don't believe this one held, though, that some courts hold that the disclosure has to be public. And I believe the Illinois Department of Public Health letter doesn't mention it being public at all, and the CMS letter does reference it could be public, so they encourage Howard Grove to respond. Lastly, George Belfiore is an original source. The information he gives is independent. He personally observed these people sleeping in hallways and dayrooms on cots and rollaway beds. The information he provided materially adds to any public disclosure if this court determines there is some public disclosure caused by those two letters from public health and CMS. The last thing I want to address is counsel's remarks about a private room. There's nothing about a private room that we allege. The allege is a patient room, and patient rooms are something that is designated as a patient room, not a private room. We did get probably some arguments and nauseam at the lower level in terms of describing what a patient room is in terms of construction and things like that, but the regulation calls for a patient room which is defined as a patient room by the regulation and not in that kind of detail. So we believe that the district court erred in dismissing the complaint, and this court should reverse that holding. Thank you very much, Mr. Rosenblatt. The case is taken under advisement.